**CITY OF SHAWNEE, KANSAS and City of Merriam, Kansas, Plaintiffs,**

v.

**AT & T CORP., AT & T Communications, Inc. and AT & T Communications of the Southwest, Inc., Defendants.**

**No. 94–2444–JWL.**

United States District Court, D. Kansas.

Dec. 22, 1995.

Marvin E. Rainey, Rainey, Byrum & Rainey, Overland Park, KS, for City of Shawnee, Kansas.

Lewis A. Heaven, Jr., John D. Tongier, Holbrook, Heaven & Fay, P.A., Merriam, KS, for City of Merriam, Kansas.

John L. Vratil, W. Joseph Hatley, Patrick J. Gregory, Lathrop & Norquist, Overland Park, KS, for AT & T Corp., AT & T Communications, Inc., AT & T Communications of Southwest, Inc.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

The cities of Shawnee, Kansas (Shawnee) and Merriam, Kansas (Merriam) bring this action to determine the rights and obligations of AT & T[1] to construct, operate and main-

---

1. In the motion before the court, defendants AT & T Corp., AT & T Communications, Inc., and AT & T Communications of the Southwest, Inc. have presented joint arguments. For convenience, the court will therefore refer to defendants collectively as "AT & T" and will use that term in the singular throughout this order.

tain fiber optic telecommunications cables within each plaintiff's boundaries. Presently before the court is AT & T's motion for summary judgment (Doc. # 38). For the reasons stated below, the court makes the following rulings: (1) Merriam may not rescind its agreement with AT & T; (2) the ordinances passed by Merriam and Shawnee are invalid; (3) Merriam's nuisance claim is barred by Kansas statutory law; (4) to the extent AT & T's fiber optic cable lies within Shawnee's right-of-ways, Kansas statutory law bars Shawnee's nuisance and trespass claims; (5) to the extent AT & T's fiber optic cable lies outside Shawnee's right-of-ways, Shawnee's nuisance and trespass claims survive summary judgment; and (6) Shawnee may seek punitive damages notwithstanding its failure to seek actual damages in the pretrial order. As a result of these rulings, AT & T's motion for summary judgment is granted in part and denied in part.

## I. *Factual Background* [2]

In September and October of 1990, AT & T installed fiber optic cable (cable) within and under public right-of-ways in Shawnee and Merriam. The cable is one portion of AT & T's Topeka Diversity Reroute project, an approximately 19 mile long line laid between downtown Kansas City, Missouri and a regenerating station in Olathe, Kansas. The purpose of the Topeka Diversity Reroute is to separate AT & T's transcontinental lines. Prior to laying the cable, a north-south transcontinental line and an east-west transcontinental line were laid in a single trench. By laying the cable through Merriam and Shawnee, AT & T separated the two transcontinental lines and prevented the compromise of a single trench from disrupting its entire network.

The cable carries inter-exchange (long distance) communications and is not directly connected to any business or residence in either Shawnee or Merriam. Long distance calls in Shawnee and Merriam are routed by a local telecommunications company to a switching station connected with the cable. Through this method, AT & T provides long distance telecommunications to businesses and residences in Shawnee and Merriam.

On September 14, 1990, AT & T and Merriam entered into an agreement (Merriam Agreement) that permitted AT & T to place cable under and along Merriam streets. In exchange, AT & T agreed to make an initial payment to Merriam of $1000 and additional payments of $1000 annually for 20 years. After the Merriam Agreement was enacted by Merriam city council, AT & T made its initial payment of $1000 but has made no further payments. AT & T's failure to make the annual payments was inadvertent and AT & T states its ability and willingness to pay the amount it is in arrears.

By a letter dated December 13, 1993, Merriam, a city of the second class under Kansas law, notified AT & T that due to AT & T's failure to make its annual payments, Merriam was rescinding the Merriam Agreement with AT & T and declaring it null and void. Subsequently, on September 26, 1994, Merriam enacted Ordinance No. 1223 (Merriam Ordinance). The Merriam Ordinance states that AT & T has the right and privilege to construct, operate and maintain cables in the public right-of-ways of Merriam. The Merriam Ordinance requires AT & T to make annual payments beginning on the date of enactment of $2.50 per linear foot of right-of-way in which cable is laid. According to the Merriam Ordinance, AT & T has laid 7800 feet of cable in Merriam right-of-ways.

Also on December 13, 1993, Shawnee, a city of the first class under Kansas law, enacted Ordinance No. 2131 (Shawnee Ordinance). The Shawnee Ordinance gives AT & T the right and privilege to construct, operate and maintain cables in the public right-of-ways of Shawnee. The Shawnee Ordinance requires AT & T to pay an initial fee of $40,000 and annual payments of $2.10 per linear foot of right-of-way in which cable is laid. According to the Shawnee Ordinance, 11,955 feet of cable lie in Shawnee's right-of-ways.

In Shawnee, the cable running along 55th Street between the eastern city limits and

**2.** The following facts are either uncontroverted for purposes of this motion or are stated as

viewed in the light most favorable to plaintiffs.

Pflumm Road is buried in a four-inch steel conduit. From 55th Street south to Shawnee's southern city limit, the cable lies within a steel petroleum pipeline owned by Williams Pipeline (Williams). Williams granted AT & T a license to use the pipeline for its cable. Shawnee owns in fee simple property under which the pipeline runs. The property is not, however, a public right-of-way. Shawnee granted Williams an easement for its pipeline but the easement was restricted to oil or oil products, gas and water. Shawnee never granted either Williams or AT & T an easement to use the petroleum pipeline for telecommunications. Although Shawnee never granted AT & T an easement, Shawnee knew in 1990 that AT & T was installing its cable in the Williams pipeline.

Williams has other, apparently operating, pipelines in Shawnee. Although some of Williams's pipelines cross public streets, Shawnee has not enacted a similar ordinance directed at Williams.

AT & T has refused to make the payments required by the Merriam and Shawnee Ordinances. This suit ensued.

## II. *Legal Standard*

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R.R.*, 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

## III. *Discussion*

In this action, plaintiffs seek declaratory judgments holding the Shawnee and Merriam Ordinances valid and enforceable. Alternatively, plaintiffs allege that AT & T's cable constitutes a public nuisance. Shawnee also claims that AT & T's use of the Williams pipeline constitutes a trespass. Not surprisingly, AT & T asserts that summary judgment should be entered on its behalf on all counts and offers various arguments for its position. The court considers each in turn.

### A. *The Merriam Agreement*

AT & T argues initially that Merriam may not, as a matter of law, rescind[3] the Merriam Agreement. AT & T alleges that rescission is unwarranted because its failure to pay was inadvertent, Merriam failed to notify AT & T within a reasonable time of its election to rescind and AT & T's breaches of the agreement were not sufficiently material. Although AT & T's first two arguments do not support summary judgment, the court agrees that AT & T's breaches of the Merriam Agreement were not sufficiently material to warrant rescission and grants summary judgment on that basis.

In Kansas, the right to rescind a contract does not arise from every breach. *Baker v. Tucker*, 227 Kan. 86, 89, 605 P.2d 114, 117 (1980); *Whiteley v. O'Dell*, 219 Kan. 314, 316, 548 P.2d 798, 801 (1976); *In re*

---

**3.** The term "rescission" has been used in various ways by courts and scholars of contract law. The parties employ the term as it is used by the Kansas Supreme Court: to refer to the discharge of contractual duties. For purposes of this opinion, the court will adopt that meaning.

*Estate of Johnson,* 202 Kan. 684, 691, 452 P.2d 286, 292, *modified,* 203 Kan. 262, 452 P.2d 286 (1969). To warrant rescission of a contract for breach of its terms:

> [T]he breach of contract must be material and the failure to perform so substantial as to defeat the object of the parties in making the agreement. A breach which goes to only a part of the consideration, which is incidental and subordinate to the main purpose of a contract, does not warrant a rescission.

*In re Estate of Johnson,* 202 Kan. at 691–92, 452 P.2d at 292; *see Federal Land Bank of Wichita v. Krug,* 253 Kan. 307, 313, 856 P.2d 111, 115 (1993); *Kohn v. Babb,* 204 Kan. 245, 251, 461 P.2d 775, 780 (1969).

 AT & T maintains that rescission can only be a possible remedy if AT & T's failure to make payments was willful or intentional. For its argument, AT & T relies on the case syllabus from *Reid v. Mix,* 63 Kan. 745, syl. ¶ 2, 66 P. 1021 (1901). There the court stated:

> One seeking to rescind a mutual contract, of which time is not the essence, on the ground of delay by the other party in complying with its terms, must show either such willful and intentional delay as will evince the intention of the party delaying to treat the contract at an end, or that the delay has caused such damages as will render a decree of specific performance inequitable and unjust.

Because the parties have stipulated that AT & T's failure was inadvertent, AT & T argues rescission cannot be granted.

In determining whether rescission is an appropriate remedy, modern Kansas courts have not relied on the *Reid* syllabus. Rather, Kansas courts consistently adhere to the standard from *In re Estate of Johnson,* stated above. *See, e.g., Federal Land Bank of Wichita v. Krug,* 253 Kan. 307, 313, 856 P.2d 111, 115 (1993); *Kohn v. Babb,* 204 Kan. 245, 251, 461 P.2d 775, 780 (1969). *Johnson* states the modern standard that a party's duties under a contract may be discharged by a material breach. *See* Restatement (Second) of Contracts §§ 237–38, 241–42 (1981). Since the *Johnson* decision, no Kansas court has cited *Reid* for any purpose. This court will follow *Johnson.*

Rather than focusing on the intent of the breaching party, the *Johnson* standard asks whether the object of the parties has been defeated. Because the object of the parties can potentially be defeated by a material but inadvertent breach, the court declines to grant summary judgment on the basis of AT & T's inadvertent failure to make the required annual payments.

 AT & T also argues that rescission cannot be granted because Merriam allegedly failed to notify AT & T of its intention to rescind within a reasonable time after AT & T failed to make payments. In support, AT & T cites *Baker v. Penn Mutual Life Ins. Co.,* 788 F.2d 650 (10th Cir.1986). In *Baker,* the plaintiff first sought rescission almost eight years after the contract became effective, more than three years after the alleged date of discovery, over two years after the lawsuit commenced, and after accepting more than $365,000 in contract benefits. *Id.* at 662.

The court cannot say, as a matter of law, that Merriam waited an unreasonable amount of time to claim rescission. Although this action did commence more than three years after AT & T first breached the Merriam Agreement, Merriam sought rescission from the start of this lawsuit and Merriam has accepted no benefits from the contract after AT & T began breaching it. As a result, this theory does not compel summary judgment.

 Finally, AT & T contends that the breach of the Merriam Agreement was not sufficiently material to justify rescission. The court agrees.

 AT & T paid the initial $1000 required by the Merriam Agreement. Prior to the filing of this action, AT & T inadvertently failed to make four annual payments out of a scheduled twenty. Each time AT & T failed to make its annual payments, it breached the Merriam Agreement. As a general rule of contract law, however, if, at the time of each breach, Merriam had fully performed and AT & T's only remaining duty of performance was to pay money in independent installments, the failure to pay one or more installments does not amount to a total breach of

the entire contract. *New York Life Ins. Co. v. Viglas*, 297 U.S. 672, 56 S.Ct. 615, 80 L.Ed. 971 (1936); Restatement (Second) of Contracts § 243(3) (1981); E. Allen Farnsworth, Contracts § 8.18 (2d ed. 1990); *see Steel v. Eagle*, 207 Kan. 146, 151, 483 P.2d 1063, 1067 (1971). The applicability of the "money in installments" rule turns on two queries. First, did Merriam fully perform by enacting the Merriam Agreement. Second, did AT & T have other obligations besides making installment payments.

Turning to the first of these questions, the court concludes that Merriam fully performed by enacting the agreement. In the agreement, Merriam granted AT & T, "its successors, obligors, assigns, licensees and agents ... the right and privilege for a period of twenty years to use and occupy a portion of property in the City of Merriam, Kansas." The agreement then describes the land and details AT & T's obligations. This grant gave AT & T an interest in land.

In other words, what Merriam conveyed to AT & T more closely resembles an easement than a license. The agreement grants AT & T rights for a fixed period of time, twenty years, and authorizes AT & T to assign its rights. AT & T paid substantial consideration for its rights and Merriam may not unilaterally revoke those rights early. The agreement does not merely grant AT & T permission to enter Merriam's land in order to conduct certain activities. Instead, the agreement conveys to AT & T a specifically described area of land. The agreement authorizes AT & T to exercise control over the conveyed property by making repairs and improvements. All of these factors suggest that the conveyance granted AT & T certain rights in the land described. *See* Roger A. Cunningham *et al.*, The Law of Property (2d ed. 1993); *see also Gage v. City of Topeka*, 205 Kan. 143, 146, 468 P.2d 232, 235 (1970); *Hale v. Ziegler*, 180 Kan. 249, 257, 303 P.2d 190, 196 (1956). To use plaintiffs' own words, through the conveyance, AT & T has "appropriated and occupied for its exclusive benefit, a portion of the public street right-of-way." Plaintiffs' memorandum in opposition to summary judgment, p. 10. Because the Merriam Agreement vested AT & T with rights in the land, those rights do not depend on Merriam's continued acquiescence to AT

& T's presence. Merriam therefore fully performed when it granted AT & T rights in the described property.

As for AT & T's obligations under the agreement, in addition to an initial and then annual payments, the Merriam Agreement also requires AT & T (1) to hold Merriam harmless from all damages arising from construction, operation and maintenance of the cable; (2) to move or adjust the cable as needed for street or utility projects; (3) to locate the cable so that it does not interfere with existing pipes, mains, conduits, or sewers; (4) to prevent unnecessary obstructions of city streets; (5) to restore all streets and other property to their prior condition after installation of the cable; and (6) to name Merriam as an additional beneficiary on all performance, construction or completion bonds issued in connection with the project.

The record indicates that AT & T completed installation of the cable in 1990, prior to when AT & T first began breaching the agreement by failing to make annual payments. No cable has been laid subsequently. Merriam has not alleged that AT & T installed the cable incorrectly. As a result, AT & T's duty to locate the cable so that it does not interfere with existing pipes, mains, conduits, or sewers is not at issue. Each of the remaining five obligations in addition to paying money regulates the potential effects of the cable's presence. AT & T has no additional duties unless the specified events occur. No evidence appears in the record that raises an inference that any of those triggering events have occurred or are certain to occur eventually. Only the duty to make an initial and then annual payments is fixed and certain. The court concludes that AT & T's potential duties under the contract do not render the money in installments rule inapplicable. Until and unless a triggering event occurs, AT & T's sole obligation under the Merriam Agreement consists of remitting installment payments.

Because Merriam had fully performed and AT & T's only remaining duty of performance was to pay money in independent installments, the failure to pay one or more installments does not amount to a total breach of the entire contract. Accordingly,

the court concludes that AT & T's breaches of the Merriam Agreement do not justify rescission of the contract.

## B. *The Ordinances and Kansas Law*

The enactment of the Shawnee and Merriam Ordinances complied with the requirements of the Kansas Franchise Act, K.S.A. §§ 12–2001 *et seq.*, which governs the granting of franchises by municipalities in Kansas. Nevertheless, AT & T contends that the ordinances do not bind it because neither the Kansas Franchise Act nor the plaintiffs' Home Rule powers permit plaintiffs to levy a fee for the installation and maintenance of AT & T's cable. In response to AT & T's arguments concerning the Kansas Franchise Act, the court concludes that cities of the first class can enact franchise ordinances pursuant to the Kansas Franchise Act. Nevertheless, that statute does not authorize the challenged ordinances because AT & T's actions fall outside the statute's regulatory scope. Furthermore, the court finds that plaintiffs' home rule power to tax AT & T has been limited by state statutes uniformly applicable to all cities.

### 1. *Kansas Franchise Act: Classification of Cities*

AT & T alleges that Shawnee, as a city of the first class, lacks the authority to enact franchise ordinances. Shawnee contends that the Kansas Franchise Act applies to all cities. The court agrees with Shawnee.

By its terms, K.S.A. § 12–2001 authorizes "the governing body of any city" to enact franchise ordinances. AT & T asks this court to ignore the unambiguous language of K.S.A. § 12–2001 because of some language in *United Telephone Co. v. Hill City,* 258 Kan. 208, 899 P.2d 489 (1995). There the court stated that "[t]he express intent of the legislature in enacting the Franchise Act was to vest cities of the second and third class with the power to determine, by franchise ordinance, which company or companies shall serve their communities." *Id.* at 222, 899 P.2d at 500. Throughout the *Hill City* opinion, the court indicates that the Kansas Franchise Act applies to second and third class cities. *Id.* at syl. 3, syl. 6, syl. 7, 210–11, 220, 222, 223, 899 P.2d at syl. 3, syl. 6, syl. 7, 493, 499, 500.

The plaintiffs in *Hill City,* however, were either second class cities, *id.* at 210, 899 P.2d at 493, or third class cities. *Id.* at 212, 899 P.2d at 494. Nowhere does the opinion address the Kansas Franchise Act's applicability to first class cities.

■ The historical notes section of K.S.A. § 12–2001 lists K.S.A. § 13–2801 as a source of the present statute. K.S.A. § 13–2801, repealed the year K.S.A. § 12–2001 was enacted, granted first class cities the right to "permit the construction and operation of telegraph and telephone lines" through franchise ordinances. The court concludes that, given its plain language and historical source, K.S.A. § 12–2001 grants first class cities the right to pass franchise ordinances. The comments of the Kansas Supreme Court in *Hill City* seem to have been case specific and neither intended nor authorized to limit the statute's purview.

### 2. *Kansas Franchise Act: AT & T's actions*

■ AT & T maintains that the Kansas Franchise Act does not authorize the Shawnee and Merriam Ordinances because AT & T's activities fall outside the regulatory scope of the statute. The court agrees.

Three statutes jointly govern the relationship between telephone companies and municipalities in Kansas. Through K.S.A. § 17–1901, the state of Kansas permits:

> Corporations created for the purpose of constructing and maintaining magnetic telegraph lines [ ] to set their poles, piers, abutments, wires and other fixtures along, upon and across any of the public roads, streets and waters of this state, in such manner as not to incommode the public in the use of such roads, streets and waters.

Telephone companies have the same rights and powers. K.S.A. § 17–1902. The authority of municipalities is the subject of K.S.A. § 12–2001(a)(3), which empowers "[t]he governing body of any city [to] permit any ... corporation to: ... construct and operate telegraph and telephone lines." Should a city decide to act on its authority, K.S.A. § 12–2001(b)(5) provides that "[n]o such grant, right, privilege or franchise shall be

made to any ... corporation ... unless it provides for adequate compensation or consideration therefor."

■ In *Hill City*, 258 Kan. 208, 220, 899 P.2d 489, 498–99 (1995), the Kansas Supreme Court held that "[n]othing in the Franchise Act allows municipalities to prevent telephone companies from constructing and maintaining telephone lines upon and across any of the public roads, streets, and waters of" Kansas. The court "affirmed the right of telephone utilities to enter into cities to install lines, poles, cable, and equipment for the purpose of preserving intrastate and interstate communications." *Id.* at 222, 899 P.2d at 500. This right "may not be frustrated by cities and may be exercised with or without permission from cities." *Id.* The court then reiterated this point by stating that a city may only enact franchise ordinances "so long as that decision does not interfere with intrastate and interstate communications." *Id.*

Plaintiffs admit that the purpose of the cable passing through Merriam and Shawnee was to ensure the integrity of AT & T's transcontinental system. By laying the cable through Merriam and Shawnee, AT & T separated two transcontinental lines to prevent the compromise of a single trench from disrupting its entire network. Under *Hill City*, AT & T's right to install lines for the purpose of preserving interstate communications may not be frustrated by a franchise ordinance. Accordingly, the Kansas Franchise Act does not authorize Shawnee and Merriam to bind AT & T with the challenged ordinances.

■ The same conclusion may also be arrived at by a slightly different tack. The *Hill City* court noted that, although cities may not interfere with intrastate or interstate communications, the Kansas Franchise Act does authorize certain cities "to determine which telephone company or companies will provide them with service." *Id.* at 223, 899 P.2d at 500. Thus, franchise ordinances only bind companies providing service to a municipality.

■ In *Hill City*, after United provided unsatisfactory local, direct telephone service, two communities discontinued its franchise. United sought to upgrade its infrastructure within the communities but the communities denied it permission. As a result, United sued claiming it was entitled to enter the communities to complete its upgrade despite lack of a franchise or permission. The court determined that United sought to upgrade its system in order to provide local, direct service to those communities rather than to preserve intrastate and interstate communications. *See id.* at 222–23, 899 P.2d at 500. After close examination of *Hill City*, this court concludes that the Kansas Supreme Court would determine that "providing service" for purposes of the Kansas Franchise Act means providing local, direct services as distinguished from intrastate or interstate communications. Because AT & T's cable does not provide local, direct service to either businesses or residences in either Merriam or Shawnee, the Kansas Franchise Act does not authorize the challenged ordinances.

### 3. *Home Rule Powers: Reasonable*

■ Shawnee and Merriam assert that, aside from the Kansas Franchise Act, each city is authorized to enact the challenged ordinances through their home rule powers. AT & T initially responds that home rule does not empower plaintiffs to require payment of user fees in amounts bearing no rational relationship to the costs incurred by plaintiffs due to the cable's presence. This argument assumes that the ordinances impose a user fee. As shown below, however, the court concludes that the challenged ordinances attempt to levy a tax.[4] Being premised on a faulty assumption, AT & T's argument does not provide a basis for summary judgment.

The court concludes that the Shawnee and Merriam Ordinances exact a tax rather than a user fee. The Kansas Supreme Court has drawn the following distinction between taxes and fees:

4. Plaintiffs assert that the ordinances are neither a user fee nor a tax but rather a rent. The court is not bound by plaintiffs' characterization. *Morton Salt Co. v. City of South Hutchinson,* 159 F.2d 897, 901 (10th Cir.1947). In any event,

plaintiffs have not identified, nor has the court's research uncovered, a distinction between rent and user fee that is significant in the context of the issues raised in this case.

A tax is a forced contribution to raise revenue for the maintenance of governmental services offered to the general public. In contrast, a fee is paid in exchange for a special service, benefit, or privilege not automatically conferred upon the general public. A fee is not a revenue measure, but a means of compensating the government for the cost of offering and regulating the special service, benefit or privilege. Payment of a fee is voluntary— an individual can avoid the charge by choosing not to take advantage of the service, benefit, or privilege offered.

*McCarthy v. City of Leawood*, 257 Kan. 566, 581, 894 P.2d 836, 845 (1995) (citing *Executive Aircraft Consulting, Inc. v. City of Newton*, 252 Kan. 421, 427, 845 P.2d 57, 62 (1993)). Although some characteristics of the tolls imposed by the ordinances are consistent with a fee, closer examination indicates that the tolls are, in reality, a tax. The ordinances state that, in exchange for compensation, AT & T has the right and privilege to construct, use and maintain cables in public right-of-ways. As stated previously, however, the state legislature already granted AT & T this right. Furthermore, even if the ordinances granted AT & T a privilege or right it previously did not possess, AT & T never had the option to refuse the privilege or right. Plaintiffs enacted the ordinances after AT & T had buried the cable. As a result, AT & T could not "avoid the charge by choosing not to take advantage of the service, benefit, or privilege offered." Finally, plaintiffs maintain that the ordinances were enacted pursuant to a revenue statute, K.S.A. § 12–2001. Plaintiffs' memorandum at 25. Considering the case law, the circumstances under which the ordinances were enacted, and the plaintiffs' own arguments,

the court concludes that the object of the Shawnee and Merriam Ordinances is to tax AT & T on the basis of its cable's presence in the public right-of-ways.

The potential validity of AT & T's argument requires classifying the exacted toll as a user fee. Because the toll is a tax rather than a user fee, AT & T's argument does not warrant summary judgment.[5]

### 4. *Home Rule Powers: Limits*

██ AT & T also argues that the rights granted to telephone companies limit plaintiffs' home rule powers in this area. Specifically, AT & T maintains that K.S.A. §§ 17–1901 and 17–1902 limit the home rule power of plaintiffs to exact a fee for allowing AT & T to lay and maintain its cable.[6] The court agrees.

Municipalities in Kansas derive their home rule powers from article 12, section 5 of the Kansas Constitution, which provides in relevant part as follows:

(b) Cities are hereby empowered to determine their local affairs and government including the levying of taxes, excises, fees, charges and other exactions except when and as the levying of any tax, excise, fee, charge or other exaction is limited or prohibited by enactment of the legislature applicable uniformly to all cities of the same class: *Provided,* That the legislature may establish not to exceed four classes of cities for the purpose of imposing all such limitations or prohibitions. Cities shall exercise such determination by ordinance passed by the governing body with referendums only in such cases as prescribed by the legislature, subject only to enactments of the legislature of statewide concern applicable uniformly to all cities, to

---

**5.** Even if the ordinances imposed a user fee, the court would reach the same conclusion. AT & T contends that the ordinances use an unreasonable means to promote their objectives because the fees levied do not bear a rational relationship to the costs incurred by plaintiffs due to the cable's presence. This argument is premised on AT & T's assertion that the cable has cost each plaintiff little or no expense and, as a result, the fees exacted by the ordinances are excessive. As noted below in the discussion of AT & T's Supremacy Clause claim, AT & T has not established that plaintiffs have incurred little or no cost. Material questions of fact would therefore

preclude granting AT & T summary judgment on this theory even if the court characterized the toll as a user fee.

**6.** Plaintiffs misapprehend AT & T's argument. Plaintiffs state that AT & T alleges that K.S.A. §§ 17–1901 and 17–1902 render K.S.A. § 12–2001 inapplicable. AT & T makes no such contention. Nor should this court's ruling that K.S.A. § 12–2001 does not authorize the challenged ordinances be interpreted to mean that, under the appropriate circumstances, a city may not pass a franchise ordinance relating to telephone companies.

other enactments of the legislature applicable uniformly to all cities, to enactments of the legislature applicable uniformly to all cities of the same class limiting or prohibiting the levying of any tax, excise, fee, charge or other exaction and to enactments of the legislature prescribing limits of indebtedness.

Thus, the home rule authority of municipalities may be limited by state statutes of uniform applicability.

▪▪▪ In *New Hope Telephone Co. v. Concordia,* 81 Kan. 514, 517–18, 106 P. 35, 36 (1910), the Kansas Supreme Court found that, by K.S.A. §§ 17–1901 and 17–1902, the state gave telephone companies the right to construct telephone lines through cities "in a manner as shall not incommode the public in the use of the streets for other purposes." A city may only "reasonably regulate the manner and place of construction of the lines." *Id.; accord Hill City,* 258 Kan. at 219, 899 P.2d at 498. The rights granted to telephone companies "may not be frustrated by cities and may be exercised with or without permission from the cities." *Hill City,* 258 Kan. at 222, 899 P.2d at 500.

By the reasoning of *New Hope* and *Hill City,* a telephone company may wield the rights granted by K.S.A. §§ 17–1901 and 17–1902 against a city of any classification. In other words, K.S.A. §§ 17–1901 and 17–1902 are uniformly applicable. As a result, these statutes limit what ordinances may be enacted pursuant to home rule power. The statutes do not limit a city's home rule power to reasonably regulate the manner and place of construction of the lines. The sections of the Shawnee and Merriam Ordinances that impose a tax on AT & T regulate neither the manner of construction nor the place of construction. On the contrary, taxes may frustrate or even deny a telephone company's right to install lines by making it prohibitively expensive. Accordingly, the home rule power of plaintiffs cannot be cited as authority for the ordinances.

### C. *The Ordinances and Federal Law*

In addition to being unjustified by state law, AT & T submits that the Shawnee and Merriam Ordinances violate the United States Constitution. Specifically, AT & T contends that the Commerce Clause, the Supremacy Clause and the Equal Protection Clause invalidate either or both of the challenged ordinances. None of these arguments compel summary judgment.

#### 1. *Commerce Clause*

▪▪▪ The Commerce Clause expressly empowers Congress to regulate commerce among the states. U.S. Const. Art. I, § 8, cl. 3. It also implicitly limits a state's authority to burden interstate commerce. *Oregon Waste Systems v. Dept. of Env. Quality,* —— U.S. ——, ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). This limit on a state's authority has been termed the "dormant" Commerce Clause. Due to the dormant Commerce Clause, states may not unjustifiably "discriminate against or burden the interstate flow of articles of commerce." *Id.* The dormant Commerce Clause similarly limits the authority of political subdivisions of a state to burden interstate commerce. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,* 504 U.S. 353, 360, 112 S.Ct. 2019, 2024, 119 L.Ed.2d 139 (1992).

▪▪▪ AT & T argues that the Shawnee and Merriam Ordinances violate the Commerce Clause by imposing excessive user fees that unduly burden interstate commerce. The court has already concluded, however, that the challenged ordinances attempt to impose a tax rather than a user fee.[7]

---

7. The court reached this conclusion applying Kansas law. Applying federal law would reach the same result. The Tenth Circuit has stated that "every burden which the state imposes upon its citizens with the view of revenue for support of its government or any of its political subdivisions, is levied under the power of taxation, whether under the name of a tax or some other designation." *Morton Salt Co.,* 159 F.2d at 901. A tax generates general revenue for the taxing entity. *See Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 621, 101 S.Ct. 2946, 2955, 69 L.Ed.2d 884 (1981). A user fee is "a specific charge imposed by the State for the use of state-owned or state-provided transportation or other facilities and services." *Id.* For the reasons stated above, the court concludes that plaintiffs enacted the ordinances to generate revenue for support of each city rather than to defray the costs of permitting AT & T to install and maintain its wires.

The constitutionality of user fees and taxes under the Commerce Clause is determined by different standards. *See id.* (recognizing the distinction); *compare Northwest Airlines, Inc. v. County of Kent, Michigan,* —— U.S. ——, ——, 114 S.Ct. 855, 864, 127 L.Ed.2d 183 (1994) (stating test for user fees) (citing *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972)), *with Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* —— U.S. ——, ——, 115 S.Ct. 1331, 1337, 131 L.Ed.2d 261 (1995) (stating test for taxes) (citing *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977)). Because AT & T confined its argument under the Commerce Clause to user fees, the court denies summary judgment on this basis.

### 2. *Supremacy Clause*

 Under the Supremacy Clause, state and local statutes that stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" are preempted. *Freightliner Corp. v. Myrick,* —— U.S. ——, ——, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995) (citing *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)); *Blue Circle Cement Inc. v. Board of County Comm'rs,* 27 F.3d 1499, 1504 (10th Cir.1994) (citing *Hines* ). AT & T alleges that the Shawnee and Merriam Ordinances create an impermissible obstacle to the objectives of Congress as embodied in the Federal Communications Act, 47 U.S.C. § 151 *et seq.* (FCA).

One of purposes of the FCA is to promote the "rapid, efficient, Nation-wide and world-wide wire and radio communication with adequate facilities at reasonable charges." *Id.* § 151. AT & T argues that permitting municipalities to exact fees like the ones at issue here would cause unreasonable charges to customers. AT & T can only be correct if the fees charged bear no reasonable relationship to the costs incurred by Shawnee and Merriam due to the cable's presence. If a reasonable relationship exists, then Shawnee and Merriam are merely recovering their expenses. Although AT & T would likely pass the fee along to its customers, the increase could not be characterized as unreasonable.

AT & T asserts that the fee levied is unrelated to the costs incurred by plaintiffs due to the cable's presence because the cable has cost each plaintiff little or no expense. In support of this contention, AT & T cites plaintiffs' interrogatory answers and the deposition testimony of Shawnee's city manager, Gary Montague. The interrogatory answers, however, expressly do not purport to give a complete list of expenses incurred by Shawnee and Merriam. Mr. Montague testified that the city must locate the cable each time work is done in the area and that it is an ongoing expense to work around cable in a right-of-way. Mr. Montague also testified that work had occurred in the right-of-way in Shawnee since AT & T installed the cable. Review of this evidence thus indicates that AT & T has not established that plaintiffs have incurred little or no expense associated with the cable. AT & T offers no other argument on this point. Accordingly, the court concludes that AT & T has not satisfied its burden to prove that the fee is an impermissible obstacle to the objectives of the FCA. Summary judgment on this basis must therefore be denied.

### 3. *Equal Protection Clause*

 Under the Equal Protection Clause, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). AT & T's final constitutional argument, directed exclusively at the Shawnee Ordinance, alleges that it has not been treated the same as Williams, which AT & T believes to be a similarly situated corporation. Shawnee has not imposed a franchise ordinance on Williams for its pipelines. Nevertheless, Shawnee seeks to recover fees for AT & T's cable, including cable laid within an abandoned Williams pipeline. AT & T contends that Shawnee has therefore treated similarly situated entities dissimilarly in violation of the Equal Protection Clause.

In an attempt to establish that AT & T and Williams are similarly situated, AT & T cites the deposition of Mr. Montague and the fact that AT & T has laid cable in a pipeline licensed from Williams. Mr. Montague testified that Williams's pipelines blow out, de-

stroy streets, create construction problems and are expensive to cross when constructing streets. According to AT & T, its "fiber optic cables [and the conduits that carry them] don't erupt, blow out or destroy streets; they just sit there, silently doing their job." It appears to the court that, by dwelling on this evidence, AT & T has emphasized its differences with Williams rather than its similarities. Rather than arguing that it and Williams are similarly situated, AT & T appears to contend that Williams has received preferential treatment despite being more trouble to Shawnee than is AT & T. Rather than establishing that Shawnee treated similarly situated parties differently, AT & T has, at best, proven that Shawnee has treated dissimilarly situated parties differently.

Moreover, AT & T has not shown the circumstances under which Williams constructed its pipelines. Williams may have originally buried its pipeline on private land, which Shawnee later purchased from Williams or from another private entity subject to an easement owned by Williams. Under such circumstances, Shawnee might decide it should not or could not impose a franchise fee. Thus, despite AT & T's contention to the contrary, Shawnee's dissimilar treatment has a potential explanation.

In short, on the present record, the court concludes that AT & T has not established that it and Williams were similarly situated. As a result, summary judgment on AT & T's claim that Shawnee has committed an equal protection violation is denied.

### D. *Shawnee's Trespass Claim*

#### 1. *Statute of Limitations*

The Williams pipeline in which AT & T installed its cable lies underneath property owned by Shawnee but which is not a public right-of-way. Shawnee claims that AT & T's installation, maintenance and continuous use of the cable constitutes a trespass. AT & T argues that Shawnee's trespass claim is barred by the statute of limitations.

■ As noted previously, K.S.A. §§ 17–1901 and 17–1902 grant AT & T the right to lay its cables in the public right-of-ways without plaintiffs' permission. Neither the plain language of those statutes nor their interpre-

tation grant AT & T the right to install its lines on publicly-owned land that is not a right-of-way. *See Hill City,* 258 Kan. at 220, 223, 899 P.2d at 498, 500. As a result, the court's rulings on the Shawnee and Merriam Ordinances do not preclude AT & T's potential liability for trespass on publicly owned land that is not a right-of-way.

Under K.S.A. §§ 60–513(a)(1) and (b), an action for trespass must be brought within two years of when the "act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party." Shawnee admits that in 1990, Doug Wesselschmidt, who was either the Assistant City Engineer or City Engineer, knew that AT & T was installing its cable through the Williams pipeline. This action was filed in 1994.

■ Shawnee maintains that AT & T's cable constitutes a continuing trespass. Shawnee asserts that while AT & T first became a trespasser in 1990, it continues to be a trespasser to date because the cable has never been removed. As a result, Shawnee contends that the statute of limitations has not begun to run. Alternatively, Shawnee claims AT & T trespasses each time it transmits information through the cable. Under this theory, the statute of limitations bars recovery for transmissions made more than two years before the filing of suit but does not preclude Shawnee's entire claim.

The Kansas Supreme Court has acknowledged the validity of a continuing trespass theory. *See, e.g., Nida v. American Rock Crusher Co.,* 253 Kan. 230, 239, 855 P.2d 81, 87 (1993); *Brock v. State Highway Comm'n,* 195 Kan. 361, 366, 404 P.2d 934, 940 (1965) (citation omitted); *Wilson v. Burgess,* 186 Kan. 480, 483, 350 P.2d 776, 778 (1960). The court has not, however, delineated the theory's substance nor applied it to analogous facts.

Professor Keeton articulates the continuing trespass theory in the following manner:

The ordinary trespass is complete when it is committed; the cause of action accrues, and the statute of limitations begins to run at that time, although the consequence may be a permanent injury to the land. But in many cases, as where the defendant erects a structure or dumps rubbish upon the land of the plaintiff, the invasion is continued by a failure to remove it. In such a case, there is a continuing wrong so long as the offending object remains.

W. Page Keeton *et al.*, Prosser and Keeton on Torts 83 (5th ed. 1984). As another commentator has noted, however, "[n]ot. every trespass that continues in fact is regarded by the courts as a continuing one." Fowler V. Harper *et al.*, The Law of Torts 28 (2d ed. 1986). The continuing trespass theory raises the issue of whether a plaintiff must recover in a single action for all damages past and prospective or instead may maintain successive actions. Keeton *et al.*, *supra*, at 83–84. Under the former approach, the statute of limitations runs from the initial trespass, *id.* at 84; under the latter approach, the statute of limitations bars only so much of the trespass as lies outside the statutory period. Harper *et al.*, *supra*, at 27.[8]

Courts have not agreed on the correct approach. In cases of actual encroachment, such as a building on the plaintiff's land, courts generally treat the trespass as permanent because of the lasting nature of the structure and because the defendant is not privileged to commit a second trespass to remove the offending item. Keeton et al., *supra*, at 84; *see* Harper *et al.*, *supra*, at 29. The clearest case of a permanent trespass occurs when the trespassing structure is maintained as a necessary part of the operation of a public utility. Harper *et al.*, *supra*, at 29 (citing *Spaulding v. Cameron*, 38 Cal.2d 265, 239 P.2d 625, 627 (1952) (Traynor, J.)).

Application of these principles compels the conclusion that AT & T's cable constitutes a permanent trespass. The cable is not a temporary structure. Removal requires earth-moving equipment. It is also possible that AT & T would have to reenter onto the property in order to remove the cable.[9] Finally, although AT & T is not, strictly speaking, a public utility, it provides what many consider a basic service. As a result, just as courts have concluded electric transmission wires constitute a permanent trespass, *see Neyrey v. Louisiana Power & Light Co.*, 347 So.2d 266, 267–68 (La.App.1977), the court finds that AT & T's cable is a permanent trespass.

The statute of limitations for the cable itself therefore began in 1990 when the cable was installed and Shawnee had knowledge of it. Shawnee cannot avoid summary judgment on the basis that the cable constitutes a continuing trespass (as opposed to a permanent trespass).

AT & T has not responded to Shawnee's argument that each transmission through the cable is a new trespass. At least one court, however, has accepted Shawnee's argument. In *Ward v. McGlory*, 358 Mass. 322, 265 N.E.2d 78, 80 (1970), the Massachusetts Supreme Court held that even though the Massachusetts Electric Company did not install the wires or poles on the plaintiff's land, its act of transmitting electricity through the wires was a trespass because each transmission was "an affirmative voluntary intrusion onto the plaintiff's property."

The Kansas Supreme Court has defined a trespasser as "[o]ne who intentionally and without a consensual or other privilege enters land in possession of another or any part thereof or causes a thing or third person so to do." *Riddle Quarries, Inc. v. Thompson*, 177 Kan. 307, 311, 279 P.2d 266, 269 (1955) (citing Restatement (Torts) § 158). Liability attaches "irrespective of whether harm is thereby caused." *Id.* Shawnee did not give AT & T permission to send pulses of information through Shawnee's property. Nor did AT & T have any privilege to do so. By affirmatively sending pulses of informa-

---

8. Courts have labeled the circumstances warranting the single action approach as "permanent trespasses" and used "continuing trespass" to refer to conditions appropriate for the multiple action approach. For ease of reference, the court adopts those terms.

9. No evidence has been presented regarding whether or not AT & T could unearth its cable in a public right-of-way and then pull the cable out of the pipeline.

tion, AT & T intentionally caused a "thing" to enter Shawnee's land. Although incorporeal electronic pulses do not necessarily come immediately to mind when one thinks of a "thing", the invasion of Shawnee's right to control the use of its property is no less real because the offending item is intangible. To hold otherwise would deny Shawnee its historical right as a landowner to exclude nonowners from using its property. Thus, the court concludes that the Kansas Supreme Court would consider each pulse of information that AT & T sends through the cable to be a new trespass. The statute of limitations therefore does not bar Shawnee's trespass claim for transmissions occurring in the two years prior to the filing of this action.

### 2. Punitive Damages

Shawnee seeks punitive damages for AT & T's trespass. AT & T argues that punitive damages cannot be awarded for three reasons. First, Shawnee has not sought an award of actual damages. Second, even if actual damages had been pled, Shawnee would be entitled to no more than nominal damages. Third, Shawnee has failed to prove that AT & T's trespass was malicious, wilful or wanton.

■■■ The court agrees that Shawnee did not seek an award of actual damages in the pretrial order. Nevertheless, this failure does not bar Shawnee's claim for punitive damages. Punitive damages may be awarded incident to equitable relief provided actionable injury exists. Thus, AT & T's first two arguments do not compel summary judgment.

■■ Numerous Kansas cases have held that actual damages are a prerequisite to an award of punitive damages. *Enlow v. Sears, Roebuck and Co.,* 249 Kan. 732, 740, 822 P.2d 617, 624 (1991); *Wisker v. Hart,* 244 Kan. 36, 41, 766 P.2d 168, 173 (1988); *Stevens v. Jayhawk Realty Co.,* 236 Kan. 90, 91, 689 P.2d 786, 787 (1984); *Dicker v. Smith,* 215 Kan. 212, 215, 523 P.2d 371, 374 (1974). "The rationale for the rule requiring actual damages before punitive damages may be awarded is that we do not punish conduct, no matter how malicious or reprehensible, which in fact causes no injury." *Dicker,* 215 Kan. at 216, 523 P.2d at 375.

■■ This rationale illustrates that "actual damages" is a convenient shorthand for the more lengthy inquiry required before deciding that punitive damages are available: has a party's wilful, wanton or malicious conduct caused actionable injury. Regardless of the language used in the various opinions, Kansas Courts have consistently analyzed the facts with that inquiry in mind. For example, although the plaintiff in *Enlow* was injured by the defendant's conduct, the jury found the plaintiff to be 50 percent at fault. As a result, the injury to plaintiff was not actionable and, therefore, could not support a claim for punitive damages. *Enlow,* 249 Kan. at 740, 822 P.2d at 624. In *Stevens,* the misconduct of the defendant did not cause the plaintiff injury. Punitive damages were therefore appropriately withheld. *Stevens,* 236 Kan. at 91, 689 P.2d at 787. In *Capitol Federal Savings & Loan Ass'n v. Hohman,* 235 Kan. 815, 816–17, 682 P.2d 1309, 1310 (1984), the Kansas Supreme Court upheld an award of punitive damages even though only equitable relief was awarded. The court noted that the plaintiffs had "sustained an injury even though no actual damages were awarded." *Id.* at 816, 682 P.2d at 1310. These cases illustrate the consistent approach taken by the Kansas Supreme Court in a variety of factual settings.

Most recently, the Kansas Court of Appeals affirmed a punitive damages award in an action to set aside a fraudulent conveyance. In *Golconda Screw, Inc. v. West Bottoms, Ltd.,* 20 Kan.App.2d 1002, 894 P.2d 260 (1995), the plaintiff contracted to buy defendant's warehouse. The defendant breached the contract and judgment was entered accordingly. The warehouse was the defendant's sole asset from which it could satisfy the judgment. After judgment was entered, the defendant conveyed the warehouse to a newly formed corporation. The plaintiff sued, asserting that defendant's conveyance was fraudulent. The district court agreed with the plaintiff and set aside the conveyance. In addition the district court awarded punitive damages.

The Kansas Court of Appeals affirmed the award. The defendant's attempt to convey the warehouse in order to avoid paying the

plaintiff's judgment caused injury to the plaintiff. *Id.* at 1007, 894 P.2d at 266. The court stated that "punitive damages may be awarded to punish a wrongdoer for the willful invasion of another's rights and to deter others from committing such conduct." *Id.* "Further, punitive damages may be awarded incident to equitable relief without an award of actual damages." *Id. Golconda Screw,* the most recent Kansas case addressing the issue, thus clearly focuses on actionable injury rather than the type of relief awarded.

Adopting and applying this approach, Shawnee's failure to seek actual damages does not prevent it from seeking punitive damages. As noted above, AT & T's use of Shawnee's property without permission harms Shawnee by impinging on Shawnee's right to control the use of its property. Shawnee may seek an injunction to prevent AT & T's continuing trespass. Thus, Shawnee has suffered an actionable injury, which may support an award of punitive damages.[10]

■■■ As another argument against punitive damages, AT & T states that the record is devoid of evidence that AT & T acted wilfully, wantonly or with maliciousness. The court concludes that material questions of fact preclude summary judgment on this basis.

Under Kansas law, punitive damages may not be awarded unless the plaintiff proves by clear and convincing evidence that the defendant "acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." K.S.A. § 60-3701(c). The Kansas Supreme Court has defined wilful as "[a]n act performed with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another is a wilful act." *Folks v. Kansas Power and Light Co.,* 243 Kan. 57, 74, 755 P.2d 1319, 1333 (1988).

As evidence of AT & T's wilfulness, Shawnee points to the agreement executed between AT & T and Williams for the use of Williams's pipeline. That agreement states the following:

> [AT & T's] review of the right-of-way agreements covering the subject pipeline segment revealed that a number of the agreements contain no telecommunication rights or certain telecommunication rights, which in [AT & T's] opinion, are insufficient for the desired utilization of the pipeline segment.

Viewed in the light most favorable to Shawnee, this statement raises an inference that AT & T's use of the cable is wilful. In other words, the statement raises the inference that AT & T intended to illegally use the pipeline. This inference precludes summary judgment.[11]

**E. *Nuisance***

■■■ Although AT & T has not expressly argued the point, its papers make clear that it seeks summary judgment on plaintiffs' nuisance claims because K.S.A. §§ 17–1901 and 17–1902 authorized its actions. Because AT & T's rights are confined to the public right-of-ways, however, those statutes do not bar a nuisance claim based on the cable's presence outside the public right-of-ways, such as the public property under which the Williams pipeline runs in Shawnee.

Shawnee has not, however, stated what activity it considers a nuisance. Thus, the court holds that to the extent plaintiffs' nuisance claims refer to the cable's presence in the public right-of-ways, AT & T is granted summary judgment for the reasons stated above. As to any nuisance claim based on the cable's presence outside the public right-

---

**10.** Even if the court adopted AT & T's contention that Kansas law requires actual damages before punitive damages may be awarded, summary judgment for AT & T would still be denied. Under *Hohman,* equitable relief that is the equivalent of actual damages may support an award of punitive damages. *Hohman,* 235 Kan. at 816–17, 682 P.2d at 1310. As an alternative to seeking an injunction, Shawnee would be entitled to take steps to physically prevent AT & T's further use of cable. Shawnee could then seek to recover as actual damages the expense of stopping AT & T's unauthorized use. Thus, to use the termi-

nology of *Hohman,* the injunction is the equivalent of actual damages and may support a punitive damages award.

**11.** As part of its defense against Shawnee's punitive damages claim, AT & T seeks to admit evidence of settlement discussions between the two parties concerning Shawnee's trespass claim. Shawnee opposes the offer. The court does not find that issue appropriate for ruling here and invites the parties to present it by motion in limine if they so desire.

of-ways, the court denies AT & T summary judgment.

### IV. Trial by Jury

The parties' were forced to brief this issue in a relative vacuum. This order may affect their arguments. Recognizing this, the court declines to rule on this issue at this time. The parties shall submit additional briefing for the court's consideration in light of this order and by the deadline set in the final pretrial order for motions in limine. The issue to brief, it appears, is whether a trial by jury is guaranteed where there is an action seeking only injunctive relief and punitive damages. If the parties see it differently, of course, they are free to present the issue however they deem it appropriate.

### V. Order

**IT IS THEREFORE BY THE COURT ORDERED** that AT & T's motion for summary judgment (Doc. # 38) is granted in part and denied in part. The court grants AT & T summary judgment on its claim that Merriam may not rescind the Merriam Agreement. The court also grants AT & T summary judgment that the Merriam and Shawnee Ordinances are invalid. The court enters summary judgment against Merriam's nuisance claim and on Shawnee's nuisance and trespass claims concerning that portion of the cable within Shawnee's right-of-ways. To the extent the cable lies outside of the right-of-ways in Shawnee, however, summary judgment on Shawnee's trespass and nuisance claims is denied.

**IT IS SO ORDERED.**