**In re WORLDCOM, INC., et al., Reorganized Debtors.**

**No. 02–13533 (AJG).**

United States Bankruptcy Court, S.D. New York.

Feb. 14, 2005.

Weil, Gotshal & Manges LLP, New York, NY, Marcia L. Goldstein, Esq., Lori R. Fife, Esq., Adam P. Strochak, Esq., of Counsel, for the Reorganized Debtor.

Jenner & Block LLP, Washington, DC, David A. Handzo, Esq., J. Alex Ward, Esq., of Counsel, Special Counsel for the Reorganized Debtor.

Cadwalader, Wickersham & Taft LLP, New York, NY, Barry J. Dichter, Esq., of Counsel, Susman & Watkins, Chicago, IL, William T. Gotfryd, Esq., Arthur Susman, Esq., of Counsel, for Victor O. Browning.

Beasley, Allen, Crow, Methvin, Portis & Miles, PC, Montgomery, AL, Clinton C. Carter, Esq., Dee Miles, Esq., of Counsel, for Oscar Pinkston.

### *MEMORANDUM DECISION REGARDING DEBTORS' REQUEST FOR AN ORDER ENFORCING PLAN AND CONFIRMATION ORDER TO BAR PROSECUTION OF ACTIONS TO COLLECT ON CLAIMS INITIATED BY VICTOR O. BROWNING AND OSCAR PINKSTON*

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Reorganized Debtor, WorldCom Inc. (which became MCI WorldCom Communications, Inc. after the effective date of the confirmed plan), seeks an order barring, as discharged claims, the prosecution of two putative class actions raising trespass claims concerning its use of fiber optic cable that it installed along certain railroad rights of way.

### I. Jurisdiction and Venue

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334(b) and 157(b) of title 28 of the United States Code. This matter is a core proceeding within the meaning of section

157(b)(2)(I) and (O) of title 28 of the United States Code. This Court has retained jurisdiction pursuant to ¶¶ 32(e),(h),(i) & (m) of the order dated October 31, 2003 (the "Confirmation Order") and §§ 13.02(e),(h),(i) & (m) of the Modified Second Amended Joint Plan of Reorganization (the "Plan"). *See In re Johns–Manville Corp.*, 97 B.R. 174, 180 (Bankr. S.D.N.Y.1989). Venue is properly before this Court, pursuant to section 1409(a) of title 28 of the United States Code.

## II. Background

On July 21, 2002 and November 8, 2002, WorldCom, Inc. and certain of its direct and indirect subsidiaries (hereinafter the "Debtors") commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By entry of the Confirmation Order on October 31, 2003, this Court confirmed a plan of reorganization (the "Plan"). The Plan became effective on April 20, 2004 (the "Effective Date"). On the Effective Date, the Debtors' assets vested in MCI WorldCom Communications, Inc. ("MCI") pursuant to the Plan.[1]

The Debtors provide a broad range of communication services in over 200 countries on six continents. Through its core communications service business, which includes voice, data, internet, and international services, the Debtors carry more data over its networks than any other entity. The Debtors were the second largest carrier of consumer and small business long distance telecommunications services in the United States, and provided a broad range of retail and wholesale communications services.

On April 11, 2001, Victor O. Browning filed a lawsuit in the District Court of Leavenworth County, General Claims Division in *Browning v. MCI WorldCom Network Services et al.*, No. 0104–CV–144 (Kan. Dist. Ct. Leavenworth County, Apr. 11, 2001). The defendants removed the case to the federal district court in Kansas, which subsequently was transferred to the Northern District of Oklahoma, where it was pending as Civil Action No. 02–604–H (the "Browning Action"). The Browning Action was administratively closed by the federal court upon notification of the Debtors' bankruptcy filing. Although the matter was initially pled as a class action, no motion for class certification was filed. On May 12, 2004, Mr. Browning filed a motion to reopen the case, together with a renewed motion for remand to state court.

On March 11, 2004, Oscar Pinkston filed a lawsuit in the Circuit Court of Montgomery County, Alabama. Mr. Pinkston's lawsuit asserted claims against ITC Deltacom (a Georgia-based telecommunications company) and three fictitious defendants. The lawsuit did not name MCI or the Debtors as defendants. On April 23, 2004, three days after the Effective Date, Mr. Pinkston filed an amended complaint in the Circuit Court of Montgomery County, similar in all respects to the original complaint, except that MCI was added as a defendant. *Pinkston v. ITC Deltacom et al.*, No.2004–646(TMH) (Ala. Cir. Ct. Montgomery County, filed Mar. 11, 2004) (hereinafter "Pinkston Action."). By Notice of Removal dated May 28, 2004, MCI removed the Pinkston Action to the United States District Court for the Middle District of Alabama, where it is pending as Civil Action No. 04–523 (MEF–SRW).

Mr. Browning's claims are founded on theories of trespass and unjust enrichment on behalf of a putative class consisting of the owners of land adjacent to the railroad

---

1. WorldCom, Inc. and MCI WorldCom Communications, Inc. were affiliated companies pre-petition.

rights of way within which MCI installed fiber optic cable in Kansas, Arkansas, Indiana, Kentucky, Missouri, Nebraska, and Nevada. Mr. Pinkston raises similar claims on behalf of a putative class of landowners in Alabama.

Both Messrs. Browning and Pinkston (collectively the "Plaintiffs"), allege that although MCI obtained consent for MCI's installation of fiber optic cable from the railroads, it did not seek consent from adjacent landowners who, according to the Plaintiffs, own the fee interest underlying the railroads' rights of way. The Plaintiffs seek damages for the alleged post-petition trespass and seek disgorgement of the amounts by which MCI allegedly was unjustly enriched through its operation of the fiber optic cable. In addition, Mr. Browning requests that MCI be permanently enjoined from using and maintaining the fiber optic cables.[2]

Mr. Browning's complaint acknowledges that MCI installed the fiber optic cable in question during the late 1980s. The fiber optic cable at issue in Mr. Pinkston's complaint was installed in 1985, 1986, and 1992.

MCI requested an Order Enforcing the Plan and Confirmation Order to Bar Prosecution of these two actions. A hearing was held on August 24, 2004. This memorandum decision addresses MCI's request.

### III. Discussion

#### A. Discharge of Debts

 MCI contends that the continuation of the Plaintiffs' lawsuit violates the discharge injunction provided by the Bankruptcy Code. The Plaintiffs maintain that their suits are for events that occurred post-petition under a theory of continuing trespass.

 Under the Bankruptcy Code, the confirmation of a plan discharges "any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). A "debt" is defined as "liability on a claim," 11 U.S.C. § 101(12); a "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or right to any equitable remedy." 11 U.S.C. § 101(5). Therefore, it is necessary to determine whether such debts arose before or after the petition date.

The court in *In re Chateaugay Corp.*, 53 F.3d 478 (2d Cir.1995) (*Chateaugay II*) ruled "[h]owever broadly 'claim' is understood, it is clear that the existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." *Id.* at 497.[3]

MCI contends that the question of when a claim arises is a matter governed by *federal bankruptcy principles and not state common law tort doctrines.* The Plaintiffs maintain that state law is the applicable

---

**2.** Fiber optic cables are bundles of thin strands of very pure glass or plastic that transmit light signals over long distances. Light signals are transmitted through the strands by a laser or light emitting diodes and no electricity passes through the cables. Craig C. Freudenrich, Ph.D, *How Fiber Optics Work* <http://electronics.howstuffworks.com/fiber-optic.htm> (accessed February 7, 2005).

**3.** MCI's position is unclear as to whether claims, based on a continuing trespass theory, that arose during the post-petition/pre-confirmation period were discharged pursuant to the Plan or 11 U.S.C. § 1141(d)(1)(A). However, unless the Court determines that the transmission of the light signals at issue herein constitutes a continuing trespass, it is not necessary to address that issue.

law to determine whether a claim exists. Further, the Plaintiffs allege that because the cause of action for the continuing trespass did not arise under state law until after the Effective Date, their claims were not discharged. In *Chateaugay II*, the court stated "[a] claim exists ... if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation—'a right to payment'—under the relevant non-bankruptcy law." *Id.* at 497 (quoting *In re National Gypsum Co.*, 139 B.R. 397, 405 (N.D.Tex.1992)). Bankruptcy law determines when a claim arises, however, state law determines the elements of a particular claim. Whether a trespass is permanent or continuous is a matter of state law. Bankruptcy law only determines when the particular elements under state law were present such that a claim would arise.

MCI argues that all of the elements of the trespass existed pre-petition and, therefore, the claim should be discharged.[4] However, the Plaintiffs argue they are not looking to recover damages based on the permanent trespass by the fiber optic cables themselves. Rather, they argue that the continued transmission of "pulses"[5] through the fiber constitutes a continuing trespass. If the Plaintiffs' legal theories are correct, the elements for each alleged trespass by the light signal did not exist until it had been sent. Therefore, such

post-petition conduct, if it is considered to be separate and distinct from the trespass of the cable is not discharged upon the Effective Date because the elements of each trespass at issue did not arise prior to the petition date.

### B. Trespass

■ Historically, trespass was defined as an interference with the exclusive possession of land. Ellen P. Goodman, *Spectrum Rights in the Telecosm to Come*, 41 San Diego L.Rev. 269, 326–327 (Winter 1999). Under the traditional view, the property owner's right to exclude was the primary concern and damages were inferred. *See Ryan v. City of Emmetsburg*, 232 Iowa 600, 603, 4 N.W.2d 435 (1942). However, courts only recognized tangible invasions as trespasses; intangible invasions (such as sound, odors, particles) were considered nuisances.[6] *Maddy v. Vulcan*, 737 F.Supp. 1528, 1540 (D.Kan.1990).

■ Under the modern view, the invasion of property by an intangible that causes damage to the *res* is a trespass. *Maddy*, 737 F.Supp. at 1540 (D.Kan.1990); *Borland v. Sanders Lead. Co.*, 369 So.2d 523, 531 (Ala.1979); *see* Ellen P. Goodman, *Spectrum Rights in the Telecosm to Come*, 41 San Diego L.Rev. 269, 327–328 (Winter 1999). With the expansion of the types of invasions considered to be trespasses, the burden of proving damages resulting from such a trespass has shifted onto the plain-

---

4. More accurately, MCI's argument is that the installation of the cables may not have been a trespass, in that the installation may have been within the scope of the railroad easements or may have been entitled to install the cables through operation of law, however, if any trespass does exist it would be a permanent trespass with all of the elements for that trespass existing pre-petition. This Court does not reach any conclusion as to whether MCI's pre-petition conduct resulted in a permanent trespass and any reference to the

invasion by the fiber as a permanent trespass is not a conclusory finding of such.

5. The Plaintiffs refer to the transmissions as "pulses." As discussed in footnote 2, these "pulses" are light signals and are not electricity.

6. Nuisance is an interference with of a possessor's interest in the enjoyment of his land. *Martin v. Reynolds Metals Co.*, 221 Or. 86, 94, 342 P.2d 790 (1959).

tiff in cases of intangible trespasses. *See e.g. Maddy,* 737 F.Supp. at 1540; *Borland,* 369 So.2d at 531. Nevertheless, courts continue to presume damages when there is a tangible trespass.

Here, the issue is whether the transmission of the light signals through the fiber optic cable constitutes a continuing trespass. As will be discussed below, Kansas and Alabama state law each distinguish between tangible and intangible invasions in determining whether a trespass has occurred. Therefore, in order to make the determination of whether the transmission of light signals is a trespass, it is necessary to first determine whether the signals that pass through the fiber optic cable should be analyzed as an alleged tangible or intangible trespass under the applicable state law. If the signals are "intangible," the Court must then determine whether, under the applicable state law, damages must be established in order to constitute a trespass.

The Plaintiffs allege that the light signals sent through the fiber optic cable constitute a "continuing trespass" under state law. Mr. Browning states that the gist of his action is for "the continuing use of the fiber to transmit signal pulses (as opposed to the original installation and presence of the below ground facilities)." Browning's Obj. p. 4 (Aug. 19, 2004). Mr. Pinkston states that his action is "not for the placement of the cable, but for the reoccurring and excessive transmission of fiber optic signals." Pinkston's Obj. p. 4 (Aug. 18, 2004). The Plaintiffs argue that each light signal is a separate trespass. MCI argues that the installation of the cable, would at best, constitute a permanent trespass for which the Plaintiffs only have a single cause of action for all past, present, and future damages which has been discharged upon confirmation of the Plan and the signals, as intangible invasions which do not damage the *res,* do not amount to continuing trespass.

A continuing trespass is when repeated or continuing conduct gives rise to a series of independent wrongs. Kansas (the governing law of Mr. Browning's action) and Alabama (the governing law of Mr. Pinkston's action) each recognize the tort of continuing trespass. *See e.g. City of Shawnee v. AT & T Corp.,* 910 F.Supp. 1546, 1560 (D.Kan.1995) and *Borland,* 369 So.2d 523 (Ala.1979), respectively. The Plaintiffs acknowledge that in the case of a permanent trespass, the damages are complete when the trespass comes into existence and a plaintiff must bring one action for all past, present, and future damages. *Spar v. Pacific Bell,* 1 Cal.Rptr.2d 480, 235 Cal.App.3d 1480, 1485 (1991); *see e.g. Lackey v. Prairie Oil & Gas Co.,* 132 Kan. 754, 297 P. 679 (Kan.1931); *Motisi v. Alabama Gas Corp.,* 485 So.2d 1157 (Ala. 1986).

The Plaintiffs implicitly acknowledge that the cable installations would be treated as a permanent trespass, for which the statute of limitations would have long since expired; as the Plaintiffs are seeking damages only for the transmissions that pass through the conduits as a continuing trespass. In order to be a continuing trespass the continuing conduct or invasion at issue must be considered a separate and distinct trespass. As state law controls, as noted above, this Court must examine Mr. Browning's and Mr. Pinkston's claims separately under the applicable state law for each.

**1. Kansas State Trespass Law**

As stated above, Mr. Browning's action is governed by Kansas state law. *Miller v. Cudahy Co.,* 567 F.Supp. 892 (D.Kan.1983) provides a detailed history of the progression of trespass law in Kansas. Prior to 1930, Kansas did not recognize the

differences between permanent and continuous trespasses and the cause of action for a trespass arose upon the initial entry onto the land. *Id.* at 900. In the 1930s Kansas courts began to develop theories differentiating permanent and continuing trespasses. The court in *Miller* suggested that courts "consider the damage resulting from an abatable nuisance that causes pollution to be temporary damage, giving rise over and over again to causes of action to recover for the injuries sustained in the statutory period immediately preceding the filing of the suit, at least so long as some acts of pollution continue." *Id. at* 906. A permanent trespass is a trespass that will presumably continue on indefinitely while a continuous trespass is an abatable trespass or one that has variable damages over time. *Id.; see also Spar,* 1 Cal.Rptr.2d 480, 235 Cal.App.3d at 1485 (Cal.Ct.App.1982); *Breiggar Properties, L.C. v. H.E. Davis & Sons Inc.,* 52 P.3d 1133 (Utah 2002).

In order for there to be a continuing trespass, Mr. Browning must be able to establish that the continuing transmission of the light signals is a trespass. The Court notes that the fact that the cables are present on the land does not affect our analysis because it is not alleged that the cables are a continuing trespass, rather it is alleged that the transmissions through the cables constitute a continuing trespass. As discussed briefly above and more fully below, the elements of a trespass vary depending on whether the intrusion is tangible or intangible. In the case of a tangible intrusion, damages are inferred and a plaintiff need only demonstrate an interference with their right to exclusive possession. In cases of an intangible intrusion, the plaintiff under certain states' law must establish that the intrusion caused substantial damage to the *res.* Therefore, this Court must first determine whether Kansas law draws a distinction between tangible and intangible trespasses and if so, whether the light signal at issue would be considered an "intangible" for purposes of the trespass analysis.

Mr. Browning's argument that the light signals being transmitted through the fiber constitute a continuing trespass is supported by *City of Shawnee v. AT & T Corp.* In *Shawnee* the court ruled "[a]lthough incorporeal electronic signals do not necessarily come immediately to mind when one thinks of a 'thing,' the invasion of Shawnee's right to control the use of its property is not less real because the offending item is intangible.... Thus, the court concludes that the Kansas Supreme Court would consider each signal of information that AT & T sends through the cable a new trespass." *Id.,* 910 F.Supp. at 1561–1562. The court in *Shawnee,* without further reference to the intangible nature of the trespass ruled that the continued transmission of light signals through the fiber constituted a continuing trespass. Further, by denying summary judgment on the issue of the statute of limitations which had expired on any alleged permanent trespass, the court apparently found that the issue of damages was not a necessary element of establishing the trespass but only relevant to the amount of any damages. The *Shawnee* court limited its ruling to whether to dismiss the claim based on the statute of limitations and not whether the plaintiff may be entitled to any damages.

In *Shawnee,* the court relied upon the Supreme Judicial Court of Massachusetts' ruling in *Ward v. McGlory,* 358 Mass. 322, 265 N.E.2d 78 (Mass.1970), which ruled that "[a]lthough [the Defendant] did not install the wires or the poles, the act of connecting the wires to their source of power and continuously transmitting electricity was an affirmative voluntary intrusion onto the plaintiff's property. It is not

necessary that the electric current cause damage to or come in contact with the land." *Id.* at 325–236, 265 N.E.2d 78 (citations omitted). This case held that a transmission of an electrical current is distinct from the conduit through which it passes. Even though the defendant had not been responsible for the physical trespass by the wires, they were responsible for a trespass because they sent electric current through those wires. *Id.* (ruling that the erection of ten-foot poles and wires was outside the scope of an original road access easement granted to the easement holder and the defendant's transmission of electricity through such wires was a continuing trespass).

The *Shawnee* court acknowledged the signals were intangible, yet did not discuss that aspect in its analysis. Neither *Ward* nor the case relied upon by that court addressed the nature of the invasion (as tangible or intangible), which is a distinction made by Kansas cases. As such, the analysis presented in *Ward* and *Smith* provides limited guidance for cases of intangible trespasses in Kansas.[7]

■ This Court must decide as to how the Kansas Supreme Court would rule on the issue before the Court and whether it would follow the analysis in *Shawnee* or

follow what this Court believes is the prevailing view in Kansas in analyzing tangible and intangible trespasses. It should be noted that in *Shawnee*, AT & T did not brief the issue of whether a light signal is considered a trespass under Kansas law. *Shawnee*, 910 F.Supp. at 1561. Further, *Shawnee* cited *Riddle Quarries, Inc. v. Thompson*, 177 Kan. 307, 279 P.2d 266 (1955), which involved a physical tangible trespass, in defining a trespass under Kansas law. *Shawnee* at 1561. As referenced above, the court in *Shawnee* did not address the evolving view of trespass under Kansas and other state's laws when considering an intangible trespass even thought it had identified the trespass at issue as an intangible one. The changing definition of trespass is responsible for allowing intangible invasions to be recognized as trespass; and this changing definition clearly requires damage to the *res*. *See Maddy v. Vulcan*, 737 F.Supp. 1528 (D.Kan.1990). As discussed further below, under Kansas law, in cases of tangible trespasses damages are presumed while in cases of intangible trespass damages must be demonstrated. *Id.* In fact, the only case that the *Shawnee* court relied on is *Ward*, which is a Massachusetts case that does not discuss the intangible nature of

7. Like *Shawnee*, the *Ward* court relied on a case dealing with a tangible trespass in order to illustrate that the electricity did not have to contact or damage the land to be considered a trespass. In its decision, the *Ward* court compared the invasion by the electrical current to the invasion in *Smith v. New England Aircraft Co.*, 270 Mass. 511, 170 N.E. 385 (Mass.1930) which stated that no physical damage need come to the property in order to be a trespass and ruled that low flying planes could be considered as trespassing onto the plaintiff's land. However, the *Smith* court also noted that because of the "noise and by the presence of the aircraft and its occupants" its invasion cannot be minimized. *Smith*, 270 Mass. at 530, 170 N.E. 385 (Mass.1930). Although the court in *Smith* did not discuss

whether it was a tangible trespass, the court was concerned with the physical presence of the planes in the airspace, which suggests that this was viewed as a tangible invasion.

The *Ward* court, in it discussion of *Smith*, draws no distinction between tangible and intangible trespasses. Further, the Debtor suggests, and the Court agrees, that the decision in *Ward* may reflect that court's consideration of the potential harm associated with the electric current at issue in that case. If this were the case, treatment of electric current and low flying planes as similar in the context of a trespass would have more analytical support. However, any concern over potential harm regarding electric current considered in *Ward* would not be present regarding the light signals at issues herein.

the invasion.[8] This Court, therefore, agrees with the determination that the light signals are "intangible," however, it disagrees with the analysis and ultimate conclusion reached in *Shawnee*. Inasmuch as that court found that the signals constituted an intangible invasion, it did not follow applicable Kansas law regarding alleged intangible trespasses which requires damages to the *res* to establish the trespass.

An intangible intrusion has been defined as "something that is impalpable, or incapable of being felt by touch." *Cook v. Rockwell International Corp.*, 273 F.Supp.2d. 1175, 1200–1201 (D.Colo.2003) (quoting *Public Service Co. of Colorado v. Van Wyk*, 27 P.3d 377, 387 (Colo.2001)). The transmission of light signals across the Plaintiffs' land is an intangible invasion. *Shawnee*, 910 F.Supp. at 1561 (D.Kan. 1995). Although the fiber optic cable is present on the land, it is not the basis for the alleged trespass; it is the cable's use that the Plaintiffs have put at issue. At the hearing, Mr. Browning's attorney acknowledged that the alleged trespass is intangible and non-physical in nature. Hrg. Transcr., 25:9–26:1 (August 24, 2004).

The court in *Maddy*, 737 F.Supp. at 1540, ruled that in order for a plaintiff to recover for an indirect or intangible trespass he must show that there has been substantial damage to the property. *Id.* (citing *Borland*, 369 So.2d 523 (Ala.1979)). Further, the *Maddy* court found that "[t]he modern trend departs from the traditional rule by finding that intangible invasions of the plaintiff's property may constitute a trespass. However, the modern trend also departs from traditional trespass rules by refusing to infer damage as a matter of law, thereby eliminating the right to nominal damages." *Id.* at 1540. The *Maddy* decision also noted that "the pattern of the developing case law in other jurisdictions is clear and consistent, and the court will adopt the modern view recognized in *Borland* and *Bradley*. The Maddys make no allegation of a direct and tangible invasion of their property.... As a result, the plaintiffs cannot demonstrate a direct trespass entitling them to recovery without proof of actual and substantial damage." *Maddy*, 737 F.Supp. at 1540. Although Kansas law is limited in its discussions of intangible trespass the findings of *Maddy* and this Court are supported by Kansas law as well as being consistent with decisions of what appears to be the majority view.[9] Although *Maddy* was de-

---

8. Massachusetts cases have not specifically focused on the elements of an intangible trespass. However, at least one Massachusetts case suggests that such an intangible invasion must cause damage to the property in order to constitute a trespass when it ruled, "[a] landowner who sets in motion a force which, in the usual course of events, will damage the property of another is guilty of a trespass on such property." *Sheppard Envelope Co. v. Arcade Malleable Iron Co.*, 335 Mass. 180, 187, 138 N.E.2d 777 (Mass.1956) (upholding the lower courts decision to grant a claim for trespass based on pollutants from the defendants foundry that entered the plaintiffs land because the damage to the plaintiffs land was substantial enough to constitute a trespass). Nevertheless, Massachusetts courts do not seem to place the same emphasis on the na-

ture of the trespass as other states do. The Massachusetts courts' approach appears to be the minority view.

9. *See Gross v. Capital Electric Line Builders, Inc.*, 253 Kan. 798, 801, 861 P.2d 1326 (Kan. 1993) (distinguishing the requirements set out in *Maddy* from those in cases of tangible trespasses and citing *Maddy* as the applicable and prevailing view in Kansas regarding intangible trespasses); *Borland*, 369 So.2d 523 (Ala.1979); *Wilson v. Interlake Steel Co.*, 32 Cal.3d 229, 185 Cal.Rptr. 280, 649 P.2d 922 (Cal.1982); *Cook v. Rockwell Int'l Co.*, 273 F.Supp.2d 1175 (D.Colo.2003); *Bradley v. American Smelting and Refining Co.*, 104 Wash.2d 677, 709 P.2d 782 (1985); *Pub. Serv. Co.*, 27 P.3d 377 (Colo.2001). The District

cided before *Shawnee*, it is absent from the analysis in *Shawnee*.

 Additionally, any alleged "harm" as a result of the cable's trespass was foreseeable and calculable for all past, present, and future damages. The predictable consequence of the installation of the cable was that data or light signals would be transferred through the conduit. To the extent the cables are constitute trespass, they are a permanent trespass for which Mr. Browning is only entitled a single cause of action; unless separate unpredictable substantial harm is a result of the intangible trespass, no additional claim is warranted. Further, in Kansas the measure of damages for trespass is the difference between the fair market value of the property before and after the trespass. *Crawford v. Frazee* 144 Kan. 278, 282, 58 P.2d 1141 (Kan.1936); *see also Payne v. Consolidation Coal Co.*, 607 F.Supp. 378, 382 n. 2 (E.D.Va.1985) (finding that in an action for trespass the plaintiffs are only entitled to trespass damages; if the plaintiffs seek recovery on a theory of unjust enrichment such action must be based on an implied contract or other theory of law). Therefore, under Kansas's definition of trespass damages, any benefit to MCI is not relevant in the analysis of damages suffered by the plaintiff in a trespass action.

The Court's conclusion that Mr. Browning's cause of action is grounded in a alleged permanent trespass and not a continuing one is supported by *Spar v. Pacific Bell*. In *Spar*, plaintiffs brought suit against a telephone company for trespass and nuisance based on the existence of telephone lines and equipment that they had buried under the plaintiffs' property twenty-five years earlier. The California state appellate court held that the damages were permanent in nature because "it is difficult to imagine a more permanent encroachment than a telephone conduit buried 10 feet in the earth for approximately a quarter of a century, which is designed to have a useful life of 100 years." *Spar*, 1 Cal.Rptr.2d 480, 235 Cal. App.3d at 1487. The California court did not differentiate between the cables themselves and any transmissions that passed through them. Here, the purpose of laying the fiber optic cable was to transmit light signals; the conduit and the transmissions are inexorably linked. Mr. Browning has not shown that there is any present harm or even the potential of any harm due to the "trespass" of the light signals nor has he demonstrated why such signals should be considered independently from the conduit, which if it is a trespass is a permanent trespass. In fact, there is no clear allegation of any impact of the alleged trespasses on their property except for the benefit that MCI is deriving from the fiber optic cables' use. As a result, the presence and continued use of the cable would, if all the elements were established, constitute a permanent trespass.

It should be noted that during the hearing Mr. Browning's attorney argued that

---

Court of the District of Columbia when discussing the *Maddy* and similar cases stated

 A defendant is liable in trespass for any intentional invasion of the plaintiff's property. Under the common law, any invasion—regardless of how insignificant—constituted a trespass and entitled the plaintiff to nominal damages. Courts pragmatically modified this common-law principle as an increasing number of trespass claims were brought based on invisible, microscopic invasions of toxins or contaminants. In response, the courts fashioned a rule that required a plaintiff to prove actual harm to the property in order to prevail on a claim for trespass based on invisible particulate deposits.

*National Tel. Coop. Ass'n v. Exxon Corp.*, 38 F.Supp.2d 1, 15 (D.D.C.1998) (citations omitted).

even if a trespass did not exist, some form of recovery would be warranted, specifically a nuisance action. Mr. Browning has not asserted any legal rationale or argument to support this theory and therefore, the Court rejects this contention.

Based upon the forgoing, the Court finds that Kansas draws a distinction between tangible and intangible trespasses. Further, the Court finds, that the invasion by the light signals is an intangible invasion. Kansas law requires a plaintiff to establish damages as an element of an intangible trespass. Mr. Browning has not asserted any damages as a result of this intangible invasion and therefore he has failed to establish any trespass resulting from the transmission of light signals and hence cannot establish a continuing trespass. Therefore, any claim that would result from the installation of the cables, including their continuous use, would be limited to damages resulting from an alleged permanent trespass. Past, present, and future damages resulting from any such permanent trespass would have been considered a pre-petition claim that was discharged upon the Effective Date.

## 2. Alabama State Law Trespass

■ Mr. Pinkston's cause of action and arguments are virtually identical to those of Mr. Browning. "Alabama has long accepted the dichotomy between permanent and continuous trespass, along with the factual distinctions incident to a determination of the appropriate measure of damages." *Borland*, 369 So.2d at 531 (Ala. 1979). Further, courts have ruled that in cases of continuing trespass there may be successive actions for each continuance of the trespass. *Id.* at 531.

Mr. Pinkston relies on *Alabama Power Co. v. Gielle*, 373 So.2d 851 (Ala.Civ.App. 1979) as a basis to demonstrate that "a structure maintained on another's proper-

ty is a continuing trespass." *Id.* at 854; *contra Motisi v. Alabama Gas Corp.*, 485 So.2d 1157 (Ala.1986) (ruling that the installation of gas lines was a permanent trespass). However, the authority that Mr. Pinkston relies on considers a tangible trespass and not an intangible one that is presented here.

In the seminal case of *Borland v. Sanders Lead Co.*, the court ruled "Under the modern theory of trespass, the law presently allows an action to be maintained in trespass for invasions that, at one time, were considered indirect and, hence, only a nuisance. In order to recover in trespass for this type of invasion ... a plaintiff must show 1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and 4) substantial damages to the *res.*" *Borland*, 369 So.2d at 529 (Ala. 1979). *Borland*, which was cited by Mr. Pinkston, clearly requires substantial damages to the property in order to recover for an intangible trespass. Unlike in *Shawnee* and *Ward*, the court in *Borland* and other cases dealing with this type of "intangible" trespass require damage to the property in order for a plaintiff to recover in a trespass action.

The *Borland* court went on further to say "For an indirect invasion to amount to an actionable trespass, there must be an interference with plaintiff's exclusive possessory interest; that is, through the defendant's intentional conduct, and with reasonable foreseeability, some substance has entered upon the land itself, affecting its nature and character, and causing substantial actual damage to the *res.*" *Borland*, 369 So.2d at 530. It is the installation of the fiber optic cable and not the transmissions that pass through it that has

affected the nature and character of the Mr. Pinkston's land. Such damage is, if a result of a trespass, is a permanent trespass and the transmissions that pass through the conduit appear to be inseparable and fully contained within the cable. Therefore, based on *Borland*, this Court concludes that Alabama state law requires damage, which is separate and distinct from the installed cable, to be shown in order for the Mr. Pinkston to prevail. As in Kansas, and a majority of states, damage for a trespass action in Alabama is measured by the difference between the market value of the property before and after the trespass and not the benefit to the trespasser. *W.T. Ratliff Co. v. Henley*, 405 So.2d 141, 147 (Ala.1981). Under this theory of damages, Mr. Pinkston cannot show substantial damage to the *res* as required by *Borland* and as such there is no actionable trespass beyond that of the physical cable.

As discussed above, the view of trespass has changed over time to include intangible forms of invasion as a potential trespass. With that shift, however, courts no longer presume damages. Mr. Pinkston does not demonstrate how such transmissions interfere with his right of exclusive possession outside of the conduit's physical invasion. *See Martin v. Reynolds*, 221 Or. 86, 96, 342 P.2d 790 (1959) (stating that in some cases the defendant's conduct is not substantial enough to be regarded as a trespass). The cable is the actual physical intrusion, while the signals that travel through it cause no damage separate from that already done by the cable. Mr. Pinkston bears the burden to demonstrate how such invasions by the light signals interfere with his right of exclusive possession and the damage that has resulted from such intangible invasion.

As the court in *Sustrik v. Jones & Laughlin Steel Corp.* 413 Pa. 324, 197 A.2d 44 (1964) stated "[a] continuing trespass must be distinguished from a trespass that effects a permanent change in the condition of the land. The latter, while resulting in a continuing harm, does not subject the trespasser to liability for a continuing trespass." *Id.* at 328, 197 A.2d 44. In this case, the fiber optic cable has effected a permanent change in the condition of the land; such a change does not subject MCI to continuous trespass claims. As discussed in the context of the Browning Action, the court's holding in *Spar*, 1 Cal. Rptr.2d 480, 235 Cal.App.3d at 1487, also supports this Court's conclusion that the fiber optic cable and its continued would, to the extent it constitutes a trespass, be a permanent trespass.

Accordingly, the Court finds that Alabama distinguishes between tangible and intangible trespasses. Further, the Court finds that the alleged invasion by the transmission of the light signals is intangible in nature. Alabama law requires a plaintiff to show damages as an element of an intangible trespass. Mr. Pinkston has not alleged any damages and, as such, an action for continuing trespass cannot be sustained. Therefore, any claim that would result from the installation of the cables, including their continuous use, would be limited to damages resulting from an alleged permanent trespass. Past, present, and future damages resulting from any such permanent trespass would have been considered a pre-petition claim that was discharged upon the Effective Date.

## C. Mr. Browning's Injunction Request

Mr. Browning's request for an injunction is dependent upon that this Court finding that the transmission of light signals through the fiber optic cables is a continuing trespass and he is not seeking to have MCI remedy past trespasses. Browning's

Obj. pgs. 12–14 (Aug. 19, 2004). Based upon the Court's determination that Mr. Browning has not established that the transmission of light signals is a continuing trespass under Kansas law, the request for injunction is denied. Further, in denying such relief the Court does not reach the issue as to whether if a continuing trespass were found that injunctive relief would be appropriate.

### IV. Conclusion

The Court determines that neither Mr. Browning under applicable Kansas law nor Mr. Pinkston under applicable Alabama law has established that the transmission of light signals through the fiber optic cables is a continuing trespass. Therefore, for the reasons set forth above, any claim by Mr. Browning results from the pre-petition conduct of the Debtors and was discharged upon the Effective Date and his request for injunctive relief is denied. In addition, for the reasons set forth above, any claim by Mr. Pinkston results from the pre-petition conduct of the Debtors and was discharged upon the Effective Date.

The Debtor is to settle an order consistent with this Memorandum Decision.